# Lucas v. Commonwealth.

June 4, 1946.

Napier & Napier for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE REES—Reversing.

The grand jury of Letcher county returned an indictment against Floyd Bates and Dewey Lucas charging them with murder. Separate trials were granted. The Commonwealth elected first to try Floyd Bates, who was convicted and sentenced to life imprisonment. At the subsequent trial of Dewey Lucas the jury found the accused guilty of voluntary manslaughter, and fixed his punishment at confinement in the penitentiary for a term of ten years. Lucas appeals, and argues that the judgment should be reversed because (1) the evidence

was insufficient to take the case to the jury, and his motion for a directed verdict should have been sustained; and (2) the court erred in permitting the Commonwealth to introduce in rebuttal evidence which should have been introduced in chief.

The body of Cas Goins was found on a spur track of the Louisville & Nashville Railroad near the mouth of Thornton creek in Letcher county about daylight in the morning of June 20, 1945. His neck was broken, and his nose and one side of his face had been crushed by a heavy blow. His empty pocketbook was found at a point across the railroad track about 25 feet from the body, and a bloodstained brick was found between the rails near the body. Goins had left his home during the afternoon of June 19, after his wife had given him $100 in currency with which to purchase equipment for a small wagon mine operated by him. Goins, Floyd Bates, and appellant were at the restaurant of Sam Bates in Whitesburg during the evening of June 19. A disturbance arose in Bates' place of business, and he closed the restaurant about 10 p. m. Sylvan Hall, a deputy sheriff of Letcher county, saw the three men in front of the restaurant after it had been closed, and heard appellant and Goins arguing about money. He testified: "When I drove up they were arguing over $8.00, I believe the soldier told Goins he wanted his $8.00. I got out and demanded that they break it up or I would take them in."

Appellant had been a soldier in the United States army since August, 1940, had been stationed in an army camp in Kansas, and was at home on furlough at the time in question. Curtis Adams testified that he was in the restaurant, that appellant and Goins danced together, and Goins gave appellant $8 with which to buy whisky. The witness made the following statement concerning a conversation he had with appellant:

"He asked me if I would like to make some money and I asked him how and he said, 'Knocking a man in the head.' "

After the restaurant was closed appellant, Floyd Bates, and Goins got in a car with Sylvan Hall and two other men and rode to the mouth of Thornton creek. Troy Meade, a coal miner, left the tipple of the mine where he was working about 1:15 a. m. and passed the

mouth of Thornton creek on his way home. He saw Floyd Bates lying on the side of the road. Appellant and Goins were across the railroad track standing close together, and he heard Goins offer Lucas $5 to take him home. Farris Bates, a coal miner, passed the mouth of Thornton creek about 2:30 a.m. on his way to work. As he walked along the spur railroad track he heard a noise which he described as follows: "It sounded like you had thrown an automobile casing down." He saw two men, one in army uniform and one in dark clothes, running up the track toward him. They left the track, turned up a path, and stopped behind a large oak tree. The witness walked down the railroad a few feet and saw the body of Cas Goins lying on the right side of the track. He saw the man in uniform approaching and became frightened and ran. It was dark, and he was unable to identify the two men.

Appellant testified that on the night of the homicide the deceased gave him $7 with which to purchase whisky, and that he purchased a pint for $6. After the restaurant in Whitesburg was closed, the deceased, Floyd Bates, and appellant drove to the mouth of Thornton creek in Sylvan Hall's car. As to later events he testified as follows:

"We got out of the car there and Cas went to whistling and then we went on up there at this freight house and Cas laid down by the railroad and we laid down by him until some miners come down and asked for a cigarette and then another bunch come down and I asked one of them for his light and he said he needed it and I said 'I will give you the last $2.00 I have for it' and I looked back over there and they were laying there and Cas said 'let's wake Willie Lucas up and get him to take us home' and we left Floyd there and we went to Willie's and Cas spoke up and said 'Floyd stole my wallet' and I asked him if he didn't lose it and I helped Cas across the bridge he was so drunk. It was a railroad trestle and we got across that bridge and when Cas spoke again he said, 'I know damn well Floyd got my wallet' and Floyd said, 'you are a damn liar' and Floyd had a rock bigger than my two fists and he struck Cas somewhere in the face with it and knocked him down on his knees and Floyd run back ten or fifteen feet and hit Cas again with this rock and then he hit at Floyd four or five times with his knife and I got the light out of my hand

and at that time Cas was still conscious and he said for me to go and tell Rit and I told him I was afraid."

He testified that he left the scene of the homicide and walked to Kona, a distance of about two miles, and spent the remainder of the night at the home of his brother-in-law, Bill Sexton. On cross-examination he was asked if he made certain statements in the presence of Floyd Bates and Mrs. Eliza Bates while confined in the Harlan county jail. These statements amounted to a confession that he had robbed and then killed the deceased. He denied that he made the statements. Floyd Bates and Eliza Bates had not testified in chief, but were introduced in rebuttal by the Commonwealth. They were asked if appellant had made the statements in their presence, and they answered in the affirmative.

The evidence was amply sufficient to take the case to the jury on the issue of appellant's guilt, but we think that, under the circumstances, the evidence of his alleged confession introduced in rebuttal was prejudicially erroneous. The evidence introduced in chief by the Commonwealth tending to connect appellant with the commission of the crime was entirely circumstantial. The only direct evidence of his guilt was the alleged confession. This was not introduced for the purpose of effecting appellant's credibility as a witness, but was substantive evidence and should have been introduced in chief.

Section 224 of the Criminal Code of Practice provides that:

"The parties may then respectively offer rebutting evidence only, unless the court, for good reason in furtherance of justice, permit them to offer evidence upon their original case."

It has been held that this section of the Code is only directory. Burden v. Commonwealth, 296 Ky. 553, 178 S. W. 2d 1; Fox v. Commonwealth, 248 Ky. 466, 58 S. W. 2d 608; Jordan v. Commonwealth, 240 Ky. 391, 42 S. W. 2d 509; Logan v. Commonwealth, 236 Ky. 329; 33 S. W. 2d 25. Ordinarily the admission of testimony in rebuttal, which regularly belongs to the prosecution's case in chief, is a matter within the sound discretion of the trial court. As said in the recent case of McIntosh v. Commonwealth, 300 Ky. 799, 190 S. W. 2d 477, 479:

"Severally or collectively the Code provision and

the authorities cited do no more than affirm what the Commonwealth concedes; i. e., evidence which properly belongs in chief may be introduced in rebuttal when, in the exercise of a sound discretion, justice requires it. Whether in any given case the proffered evidence is of that strength and quality must be determined by considering it in its relationship to the other evidence and to the facts peculiar to that case.''

However, the Commonwealth should not be permitted to take undue advantage of the defendant and withhold important evidence until near the close of the trial, and then introduce it in the guise of rebuttal evidence. In Fugate v. Commonwealth, 202 Ky. 509, 260 S. W. 338, 340, where the procedure was very similar to that in the present case, the court said:

''On cross-examination, appellant, Pot Napier, and Jake Fugate were each asked if he and the others did not say and do certain things in the presence of Harlan Neace, and they answered in the negative. Thereafter Neace was called in rebuttal, and, the same questions calling for an answer of yes or no being propounded to him, he answered in the affirmative. Later on appellant, Pot Napier, and Jake Fugate were recalled in rebuttal, and interrogated in regard to the matters testified to by Neace; but the court declined to permit them to answer, on the ground that they had already testified. While trial courts have a broad discretion as to the time and manner of the introduction of evidence, the practice pursued in this case is not to be commended. The evidence in question consisted of statements and conduct on the part of appellant and of Pot Napier and Jake Fugate in his presence a short time before the homicide, and was substantive in character. That being true, it was admissible in chief, and no foundation of any kind was necessary. Had it been offered in chief, Neace would have been asked to say what the witnesses said and did in his presence, and the witnesses would have been permitted to testify in rebuttal with the proper advantage of the last say on the question. As it was, however, this advantage was given to the commonwealth with the further advantage of having Neace answer yes or no to leading questions instead of giving his own account of what occurred in his presence. Robinson v. Commonwealth, 178 Ky. 557, 199 S. W. 28.''

In Collins v. Commonwealth, 227 Ky. 349, 13 S. W. 2d 263, 265, the court permitted the Commonwealth in rebuttal to introduce evidence properly admissible in chief. The evidence was on a vital issue, but was merely cumulative. However, in condemning the ruling of the trial court, this court said:

"After the defendant had closed his testimony, the court allowed the commonwealth in rebuttal to introduce further proof showing that the balls entered at the back of the head and came out at the front. This was error. It was incumbent upon the commonwealth to introduce its whole proof in chief, and, having introduced four witnesses in chief on this subject, it could not hold back other witnesses so as to have the last tag on the question."

In the case before us it is obvious that the Commonwealth deliberately held the witnesses back in order to get an advantage. The evidence introduced in rebuttal was purely substantive in nature, and should have been introduced in chief It was the most damaging evidence offered by the Commonwealth, and its introduction during the final stages of the trial was, under the circumstances, prejudicial to appellant's rights.

The judgment is reversed, with directions to grant appellant a new trial.